# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs July 17, 2007

## STATE OF TENNESSEE v. TRISTON LEE HARRIS

**Appeal from the Circuit Court for Lawrence County**
**No. 25348     Jim T. Hamilton, Judge**

---

**No. M2006-01532-CCA-R3-CD - Filed February 6, 2008**

---

The defendant, Triston Lee Harris, appeals a certified question of law following his Lawrence County Circuit Court June 12, 2006 conviction of possession of cocaine with intent to sell, for which he received a six-year Department of Correction sentence. The defendant challenges the circuit court's denial of his motion to suppress. We hold that although the defendant's vehicle was subject to a search following a proper canine sweep, the contraband which was found on the defendant's person should have been suppressed, and we reverse the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Reversed; Remanded**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JERRY L. SMITH, J., joined. JOSEPH M. TIPTON, P.J., filed a dissenting opinion.

J. Daniel Freemon, Lawrenceburg, Tennessee, for the appellant, Triston Lee Harris.

Robert E. Cooper, Jr., Attorney General & Reporter; Lacy Wilber, Assistant Attorney General; and T. Michel Bottoms, District Attorney General, for the appellee, State of Tennessee.

## OPINION

When the trial court denied the defendant's motion to suppress evidence seized during a vehicle "stop," the defendant pleaded guilty via a plea petition that recited the reservation for appeal of a certified question of law that addressed the legality of the stop and search. The judgment, dated and entered on June 12, 2006, contained no reference to a certified question of law. On June 30, 2006, the trial court dated and entered an order directing that the recitation of the certified question be attached to the judgment. The defendant filed his notice of appeal on July 10, 2006. On August 25, 2006, the trial court entered an amended judgment that recited the certified question.

## I. Appellate Jurisdiction

The State argues in its brief that this court is lacking jurisdiction because the rigors for certifying an appellate question were not satisfied. Reserving a certified question of law for appellate review is governed by Rule 37(b)(2) of the Tennessee Rules of Criminal Procedure, which provides,

> An appeal lies from any order or judgment in a criminal proceeding where the law provides for such appeal, and from any judgment of conviction:
>
> . . . .
>
> (2) Upon a plea of guilty or nolo contendere if:
>
> (i) The defendant entered into a plea agreement under Rule 11(e) but explicitly reserved with the consent of the state and of the court the right to appeal a certified question of law that is dispositive of the case, and the following requirements are met:
>
> (A) The judgment of conviction, or other document to which such judgment refers that is filed before the notice of appeal, must contain a statement of the certified question of law reserved by the defendant for appellate review;
>
> (B) The question of law must be stated in the judgment or document so as to identify clearly the scope and limits of the legal issue reserved;
>
> (C) The judgment or document must reflect that the certified question was expressly reserved with the consent of the state and the trial judge; and
>
> (D) The judgment or document must reflect that the defendant, the state, and the trial judge are of the opinion that the certified question is dispositive of the case[.]

Tenn. R. Crim. P. 37(b)(2)(i)(A)-(D).

As in any other appeal before this court, our first concern is whether this court is authorized to hear the case, and in the present case, the State claims that this court lacks jurisdiction. Jurisdiction to hear a direct appeal following a guilty plea generally must be predicated upon the provisions for reserving a certified question of law. "Appeals of certified questions of law run

counter to the general rule that a defendant enjoys no right of appeal following a guilty plea." *State v. Festus Babundo*, No. E2005-02490-CCA-R3-CD, slip op. at 3 (Tenn. Crim. App., Knoxville, May 26, 2006); *compare* Tenn. R. Crim. P. 37(b)(1) with *id.* 37(b)(2).

Because of the dispensatory nature of a certified question appeal, our supreme court firmly rejected a rule of substantial compliance, *see State v. Armstrong*, 126 S.W.3d 908, 912 (Tenn. 2003), and instead demanded strict adherence to Rule 37(b), as that rule has been amplified by the court itself. For instance, in *State v. Pendergrass*, our supreme court "emphasized" that

> [r]egardless of what has appeared in prior petitions, orders, colloquy in open court or otherwise, the final order or judgment from which the time begins to run to pursue a T.R.A.P. 3 appeal *must contain a statement of the dispositive certified question of law reserved* by defendant for appellate review and the question of law must be *stated so as to clearly identify the scope and the limits of the legal issue reserved*. For example, where questions of law involve the validity of searches and the admissibility of statements and confessions, etc., the reasons relied upon by defendant in the trial court at the suppression hearing must be identified in the statement of the certified question of law[,] and review by the appellate courts will be limited to those passed upon by the trial judge and stated in the certified question, absent a constitutional requirement otherwise. Without an explicit statement of the certified question, neither the defendant, the State nor the trial judge can make a meaningful determination of whether the issue sought to be reviewed is dispositive of the case. . . . Also, the order must state that the certified question was expressly reserved as part of the plea agreement, that the State and the trial judge consented to the reservation and that the State and the trial judge are of the opinion that the question is dispositive of the case. Of course, the burden is on defendant to see . . . that the record brought to the appellate courts contains all of the proceedings below that bear upon whether the certified question of law is dispositive and the merits of the question certified. No issue beyond the scope of the certified question will be considered.

*State v. Pendergrass*, 937 S.W.2d 834, 836-37 (Tenn. 1996) (quoting *State v. Preston*, 759 S.W.2d 647, 650 (Tenn. 1988)); *see State v. Lillie Fran Ferguson*, No. W2000-01687-CCA-R3-CD, slip op. at 4-5 (Tenn. Crim. App., Jackson, Apr. 27, 2001) (lamenting general, widespread failure to comply with *Preston-Pendergrass* and citing cases in which court of criminal appeals has dismissed certified-question appeals).

This court has said that, given the mandate for strict compliance, ineffectual certified question appeals continue to "add[] to the growing heap of appellate fatalities that have resulted when would-be appellants failed to heed the *Preston-Pendergrass* litany of requirements for certified-question appeals." *State v. Carl F. Neer*, No. E2000-02791-CCA-R3-CD, slip op. at 2 (Tenn. Crim. App., Knoxville, Oct. 8, 2001). The present case is not without a certain amount of Rule 37 drama, but we ultimately conclude that the defendant has satisfied the requirements.

The June 12, 2006 judgment does not indicate at all that a certified question was reserved. Rule 37 requires that "the judgment or [other document to which such judgment refers that is filed before the notice of appeal] reflect[] that the certified question was expressly reserved with the consent of the state and the trial court." Tenn. R. Crim. P. 37(b)(2)(A)(iii). Furthermore, the "judgment or document [must] reflect that the defendant, the state, and the trial court are of the opinion that the certified question is dispositive of the case." *Id.* at 37(b)(2)(A)(iv). Although a Rule 37(b) appeal may be advanced when the otherwise nonconforming judgment incorporates by reference an existing document that satisfies the terms of the *Preston-Pendergrass* rule, *see, e.g.*, *State v. Chance Coy Herron*, No. M2004-00553-CCA-R3-CD, slip op. at 3 (Tenn. Crim. App., Nashville, Dec. 1, 2004), the judgment under review incorporated nothing.

That said, we will treat the June 30 order as an amendment to the June 12 judgment. It was entered while the trial court still had jurisdiction to amend the judgment, and it contains all of the *Preston* components. Thus, the order amends the judgment form and brings it into compliance with Rule 37 and *Preston*. *But see* Tenn. R. Sup. Ct. 17 (specifying the use of a prescribed form for expressing judgments in criminal cases).[1]

## II. Suppression of Evidence

Lawrenceburg police officer Michael Kilpatrick testified in the suppression hearing that he was trained as a narcotics officer and as the handler of a narcotics sniffing dog. On March 9, 2005, he drove his marked police car behind a 1983 Chevrolet Monte Carlo driven by the defendant on Honeysuckle Drive in Lawrenceburg. Officer Kilpatrick testified that "[w]hen [he] got behind the [Monte Carlo, he] noticed the seat belt dangling [at] the side of the driver; and I could see clearly that he wasn't wearing [the seatbelt]." Officer Kilpatrick testified that he activated his blue lights and "stopped [the defendant] for a seat belt violation." Officer Kilpatrick testified that he then asked the defendant for his registration and insurance documentation but that the defendant replied that he had no such documentation.

Officer Kilpatrick testified that the defendant and a passenger "appeared to be very nervous" and did not look at him while he spoke to them. The officer asked the defendant to emerge

---

[1]The attempt to use a corrected judgment form to amend the judgment itself on August 25, 2006, is ineffectual. The defendant filed his notice of appeal on July 10, 2006. The trial court lost jurisdiction to amend its order at that time. *Pendergrass*, 937 S.W.2d at 837-38 (Tenn.1996); *State v. Timothy S. Oglesby*, No. M2000-02134-CCA-R3-CD, slip op. at 2-3 (Tenn. Crim. App., Nashville, Feb. 21, 2002).

from the vehicle so the officer could "issue citations for seat belt, registration and insurance." The officer testified that the defendant would not stand where he told him to stand and that the defendant "kept pacing back and forth," making the officer "increasingly nervous."

Reacting to the nervousness of the defendant as well as to his own anxiety about the defendant's demeanor, the officer "performed a pat-down for weapons." He found no weapons. He testified, however, that the defendant could not answer questions about "where he was going, what he was doing in Lawrenceburg; he was from Pulaski." Officer Kilpatrick asked the defendant for consent to search the Monte Carlo, but the defendant declined.

Officer Kilpatrick then testified that he asked a second officer who had arrived on the scene to complete the traffic citation forms. While the second officer performed this task, Officer Kilpatrick led his dog around the defendant's car. He testified that the dog "showed a noted response on the passenger-side door, . . . scratching on the passenger-side door." When Officer Kilpatrick asked the defendant why the dog had reacted positively, the defendant denied any knowledge of narcotics. "At that time," Officer Kilpatrick testified, "I did a more thorough pat-down of [the defendant's] person. When I reached the crotch area, I felt a – from the left side, I felt a rock-like object in the lower crotch area of his pants." Officer Kilpatrick testified that, from his experience, he recognized the object as cocaine; he then arrested the defendant and, after a brief resistance from the defendant, handcuffed him. He then removed the rock-like object and, upon performing a field test, discovered it to be seven grams of cocaine.

The officers then arrested the passenger in the Monte Carlo, Josh Hayes, who possessed on his person 22 grams of cocaine.

Officer Kilpatrick then introduced into evidence and played for the court a videotape of the March 9, 2005 encounter with the defendant as recorded by a video recorder in his patrol car.

On cross-examination, Officer Kilpatrick testified that 12 to 15 minutes would be required to check for warrants and to fill out the citations. He testified that he stopped the Monte Carlo at about 5:27 p.m. and handcuffed the defendant at 5:44 p.m. He testified that he heard from dispatch that no warrants were outstanding for the defendant while he was walking the dog around the car. Officer Kilpatrick testified that he stopped the Monte Carlo in a "high drug area. There was a drug house at that time, just right down the road . . . ."

Officer Kilpatrick testified that, for his own safety, he routinely asked detainees to step out of their vehicles when he wrote them citations. He admitted that he could have written the citations while the defendant remained seated in his car.

Based upon the foregoing evidence, the trial court overruled the defendant's motion to suppress the cocaine Officer Kilpatrick found on the defendant's person.

On appeal, the defendant challenges first the validity of the initial stop. Although he characterizes the stop as investigatory, he acknowledges in his brief that the stop "was justified by the failure of the defendant to have his seatbelt fastened." The defendant postulates, however, that the duration of the detention exceeded the time that would have been reasonable for the issuance of a seatbelt citation. The defendant also claims that the "hit" of the drug dog on the passenger-side door did not implicate the defendant, who was the driver of the vehicle, and that, again, the investigative process exceeded the time that would have been reasonable for a traffic stop. He also claims generally that the detention of the defendant was without probable cause or reasonable suspicion. Essentially, the State maintains that, beginning with a proper discovery of a seatbelt violation, the officer legitimately and incrementally acquired information that led to probable cause to arrest the defendant for possession of cocaine. We hold that the warrantless, evidence-yielding search of the defendant was not justified by any exception to the warrant requirement and that such evidence was inadmissible.

Both the United States and Tennessee Constitutions protect against unreasonable searches and seizures. U.S. Const. amend IV; Tenn. Const. art. 1, § 7. The intent and purpose of the prohibitions against unreasonable searches and seizures found in the Tennessee Constitution correspond to the provisions found in the Fourth Amendment to the United States Constitution. *See State v. Simpson*, 968 S.W.2d 776, 779 (Tenn. 1998).

A search or seizure conducted without a warrant is presumed unreasonable, thereby requiring the State to prove by a preponderance of the evidence that the search or seizure was conducted pursuant to an exception to the warrant requirement. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043 (1973); *Simpson*, 968 S.W.2d at 780. Thus, a trial court necessarily indulges the presumption that a warrantless search or seizure is unreasonable, and the burden is on the State to demonstrate that one of the exceptions to the warrant requirement applied at the time of the search or seizure.

Because stopping an automobile without a warrant and detaining its occupants unquestionably constitutes a seizure, the State in the present situation carried the burden of demonstrating the applicability of an exception to the warrant requirement. *See, e.g., State v. Cox*, 171 S.W.3d 174, 179 (Tenn. 2005) (temporary detention of an individual during a traffic stop constitutes seizure that implicates the protection of both the state and federal constitutions); *State v. Keith*, 978 S.W.2d 861, 865 (Tenn. 1998).

When a party appeals the trial court's ruling on a suppression motion, the standard of appellate review requires acceptance of the trial court's findings regarding "questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence," unless the evidence preponderates against the findings. *State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Cothran*, 115 S.W.3d 513, 519 (Tenn. Crim. App. 2003). However, "when a trial court's findings of fact on a motion to suppress are based solely on evidence that does not involve issues of credibility, appellate courts are just as capable to review the evidence and draw their own conclusions." *State v. Binette*, 33 S.W.3d

215, 217 (Tenn. 2000). In that situation, "a reviewing court must examine the record de novo without a presumption of correctness." *Id.* Moreover, the application of the law to the facts found by the trial court is a question of law that is reviewed de novo. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000); *Odom*, 928 S.W.2d at 23.

We typically analyze searches and seizures involving vehicles and their occupants by starting with the initial police-citizen encounter and progressing through the chronological sequence of events.

In the present case, the initial police-citizen encounter was Officer Kilpatrick's stopping the defendant's vehicle. The officer saw the defendant's seatbelt dangling unengaged from the door post while the defendant drove the car, and as such, the officer witnessed a violation of Tennesee Code Annotated section 55-9-603. *See* T.C.A. § 55-9-603(a)(1) (2004) ("No person shall operate a passenger motor vehicle on any highway, as defined in § 55-8-101(22), in this state unless such person and all passengers four (4) years of age or older are restrained by a safety belt at all times the vehicle is in forward motion."); *see also id.* § 55-9-603(d)(1) ("A violation of this section is a Class C misdemeanor."); *id.* § 55-9-603(f)(1) ("A law enforcement officer observing a violation of this section shall issue a citation to the violator, but shall not arrest or take into custody any person solely for a violation of this section."). The statutory violation witnessed by the officer yielded probable cause that justified the traffic stop. *See State v. Vineyard*, 958 S.W.2d 730, 735-36 (Tenn. 1997) (holding that the officer's witnessing a traffic offense gave him probable cause to stop the offending driver "without regard to the subjective motivations" of the officer); *see also Whren v. United States*, 517 U.S. 806, 116 S. Ct. 1769 (1996). Thus, Officer Kilpatrick performed within constitutional bounds in initially seizing the defendant by activating his blue lights and stopping the defendant's vehicle.

While initially interviewing the defendant, who remained in the driver's seat of his car, the officer asked him for documentation of vehicle registration and insurance. "[R]equests for driver's licenses and vehicle registration documents, inquiries concerning travel plans and vehicle ownership, computer checks, and the issuance of citations are investigative methods or activities consistent with the lawful scope of any traffic stop." *State v. Gonzalo Garcia*, No. M2000-01760-CCA-R3-CD, slip op. at 22 (Tenn. Crim. App., Nashville, Feb. 20, 2002) (citing *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000); *United States v. Hill*, 195 F.3d 258, 268 (6th Cir. 1999); *United States v. Lyton*, 161 F.3d 1168, 1170 (8th Cir. 1998)), *overruled on other grounds by State v. Garcia*, 123 S.W.3d 335 (Tenn. 2003). Thus, in the present case, the officer's questions were reasonable and within the scope of the limited ambit of investigation entrusted to the officer in the situation. The questioning revealed additional statutory violations. *See* T.C.A. § 55-3-102(a)(1) (2004) (proscribing as a Class C misdemeanor driving "upon any highway any vehicle of a type required to be registered . . . which is not registered or for which the appropriate fee has not been paid when and as required . . . ."); *id.* § 55-12-139(b), (c) (2004) (requiring officer who has charged a motorist with any "moving violation" to "request evidence of financial responsibility" and proscribing the failure to "provide evidence of financial responsibility" as a Class C misdemeanor punishable only by a fine . . . .").

The next event of possible constitutional significance is the officer's requesting the defendant to stand outside his car while the officer wrote the citations for the seatbelt, registration, and financial responsibility violations. Although this action arguably exacerbated the seizure in progress, we agree with the trial court that the officer's habit of having motorists exit their vehicles during the completion of paperwork was a justifiable safety measure, especially in view of the benign nature of the intrusion. *See Pennsylvania v. Mimms,* 454 U.S. 106, 109-11, 88 S. Ct. 330, 332-33 (1977) (holding that an officer may, as a matter of course, ask that a driver step out of the vehicle during a traffic stop); *State v. Pulley*, 863 S.W.2d 29, 34 (Tenn. 1993) ("'The reasonableness of a stop turns on the facts and circumstances of each case [including] . . . the nature and scope of the intrusion'") (quoting *United States v. Mendenhall*, 446 U.S. 544, 561, 100 S. Ct. 1870, 1881, (1980) (Powell, J., concurring)); *see also State v. James Oliver Grayless*, No. 03C01-9510-CC-00311, slip op. at 9 (Tenn. Crim. App., Knoxville, Dec. 5, 1997) (referring to the officer's request that the motorist exit his vehicle and characterizing the "nature and scope of this intrusion [as] slight"). While focused on his paperwork, an officer is especially vulnerable to the seclusion and procurement of a weapon by a detainee who is sitting inside a vehicle.

Next, reacting to the defendant's nervousness and failure to stand still, Officer Kilpatrick "patted down" the defendant's clothing to assure himself that the defendant possessed no weapons. *See Terry v. Ohio*, 392 U.S. 1, 26-28, 88 S. Ct. 1868, 1882-83 (1968) (adjudicating as reasonable a police officer's detention of a citizen based upon the officer's reasonable suspicion supported by specific and articulable facts that a criminal offense has been or is about to be committed and frisking the detainee for weapons upon a reasonable suspicion that the detainee may be armed). We need not belabor a constitutional analysis here because the pat-down resulted in no seizure of evidence and no discovery of inculpatory information. The same is true of the officer's ensuing request for consent to search the vehicle. The defendant denied the request, and the officer did not attempt to search the vehicle.

The next constitutionally remarkable event was Officer Kilpatrick's use of the drug-sniffing dog to survey the exterior of the defendant's vehicle. Officer Kilpatrick testified that a second officer had arrived on the scene and that Officer Kilpatrick asked the second officer to complete the citation forms while Officer Kilpatrick led the dog around the vehicle. The dog reacted positively to the passenger-side door.

The "sniff" of a narcotics-seeking dog is *sui generis* and does not implicate any legitimate privacy interest; consequently, a dog's sniff does not per se constitute a search under the Fourth Amendment and requires neither probable cause nor reasonable suspicion. *United States v. Place*, 462 U.S. 696, 707, 103 S. Ct. 2637, 2644-45 (1983); *State v. England*, 19 S.W.3d 762, 766-67 (Tenn. 2000). The United States Supreme Court has said that a dog sniff performed on the exterior of a defendant's car "while he was lawfully seized for a traffic violation" did not rise to the level of a constitutionally cognizable infringement. *Illinois v. Caballes*, 543 U.S. 405, 409, 125 S. Ct. 834, 838 (2005).

Accordingly, in dog sniffing cases, the constitutional inquiry focuses not upon the means used to detect the presence of narcotics but rather the time it takes to conduct the dog's sweep of the vehicle. An otherwise lawful canine sweep that is ancillary to a legitimate traffic stop may constitute an unlawful search if the suspect is detained beyond the time necessary to complete the traffic stop. *See United States v. Jacobsen*, 466 U.S. 109, 124, 104 S. Ct. 1652, 1662 (1984) (indicating that seizure that is lawful at its inception can violate Fourth Amendment if its manner of execution unreasonably infringes interests protected by constitution); *State v. Troxell*, 78 S.W.3d 866, 871 (Tenn. 2002) (indicating that reasonable traffic stop can become unreasonable and constitutionally invalid if time, manner, or scope of investigation exceeds the proper parameters); s*ee also State v. Justin Paul Bruce*, No. E2004-02325-CCA-R3-CD, slip op. at 7 (Tenn. Crim. App., Knoxville, Aug. 22, 2005).[2]

The officer needs no suspicion or cause to "run the dog around" the stopped vehicle if he does it contemporaneously with the legitimate activities associated with the traffic violation. *Caballes*, 543 U.S. at 409, 125 S. Ct. at 837-38 (upholding constitutionality of dog sniff conducted by an officer "[w]hile [a second officer] was in the process of writing a warning ticket, [the second officer] walked his dog around [Caballes'] car" and stating that the use of the dog during Caballes' traffic stop "did not implicate legitimate privacy interests" because "the dog sniff was performed on the exterior of [Caballes'] car *while* he was lawfully seized for a traffic violation") (emphasis added); *England*, 19 S.W.3d at 767-68 (upholding constitutionality of a dog sniff *while* the officer waited for a reply to a records check following a stop for a license-plate-lighting violation, stating that "the canine sweep did not constitute a search under the Fourth Amendment and therefore required neither probable cause nor reasonable suspicion"). If the officer conducts the dog sniff after these activities are – or should have been – completed, *see generally Justin Earl Bruce,* he is engaging the motorist in an unconstitutional detention, unless an independent basis for suspicion has legitimately evolved. *State v. Morelock*, 851 S.W.2d 838, 840 (Tenn. Crim. App. 1992) (holding that a constitutional violation occurred when the officer issued the motorist a citation, was denied permission to search the trunk of the motorist's vehicle, sent for a drug sniffing dog, and used the dog to detect drugs in the trunk).[3]

---

[2] Interlocking with these rules of constitutional force, Tennessee Code Annotated sections 40-7-118 and 55-10-207(a) provide that when an officer observes the commission of certain misdemeanors, the officer is required to cite and release the misdemeanant in lieu of effecting a custodial arrest. T.C.A. §§ 40-7-118(b)(1) (2003), 55-10-207(a) (Supp. 2003). These more general "cite and release" statutes are in addition to the specific "cite and release" provisions contained in code section 55-9-603(f)(1), which we have cited above. "Accordingly, the Tennessee 'cite and release' statute creates a presumptive right to be cited and released for the commission of a misdemeanor." *State v. Walker*, 12 S.W.3d 460, 464 (Tenn. 2000). A custodial arrest in violation of the "cite and release" statute constitutes a violation of the right against an unreasonable search and seizure. *See id.* at 467.

[3] The officer stopped Morelock because his license plate was not properly illuminated. A records check had revealed that Morelock had been issued a valid driver's license, but Morelock did not have the license in his possession at the time of the stop, resulting in a citation. This court in *Morelock* commented that if the officer had chosen "not to allow Morelock to resume his journey without a driver's license in his immediate possession, which would itself have been a violation, he could have directed Morelock to lock the car and leave it parked until another person could legally

(continued...)

Therefore, in sum and "[s]imply put, a law enforcement officer making a valid traffic stop must not prolong the stop for longer than necessary to process the traffic violation without having some reasonable suspicion of other criminal activity sufficient to warrant prolonging the stop." *State v. Walker*, 12 S.W.3d 460, 464 (Tenn. 2000). Thus, either (1) the canine sweep of the defendant's vehicle must be properly accommodated *within* the duration and scope of the legal traffic stop or, if not, (2) it must be independently justified by the facts. In the present case, we hold that the canine sweep was conducted within the duration and scope of the legal traffic stop.

Officer Kilpatrick performed the dog's sweep of the stopped vehicle while the second officer completed the citation forms. The records-check report was not received until the dog-sweep was in progress. The evidence supports a conclusion that the legal detention of the defendant during the process of issuing the citations was not unduly protracted to accommodate the dog's sweep. Thus, Officer Kilpatrick's actions were within constitutional bounds when he discovered information via the trained dog's reaction that the vehicle contained narcotics.

We now move on to consider the constitutional implications of Officer Kilpatrick's second pat-down of the defendant. When the dog reacted to the passenger side door of the vehicle, Officer Kilpatrick asked the defendant why the dog would have reacted, and the defendant denied knowledge of any contraband. The officer then conducted a "more thorough" pat-down of the defendant and detected a rock-like substance in the crotch area beneath the defendant's clothing. The officer testified that, based upon his experience, he knew that the defendant was concealing cocaine inside his pants. The officer retrieved the rock, which he determined was cocaine. Of course, this is the evidence that the defendant sought to suppress.

Initially, we pause to clarify that, although Officer Kilpatrick characterized the second pat-down as just that – a "pat-down" of the defendant, albeit more thorough than the first, neither this characterization nor the choice of "patting" as a means of discovery galvanizes the activity from constitutional attack. The authority to pat-down, or frisk, in the absence of probable cause, remains circumscribed by the dictates of *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968), in which the Supreme Court approved the limited and temporary seizure of a person for questioning and for a "pat-down" *for weapons if an officer has a reasonable suspicion that the person is armed and dangerous*. *Id.* at 26-28, 88 S. Ct. at 1882-83. Although the officer articulated his anxiety about the defendant's nervous behavior prior to performing his first pat-down and testified that the first pat-down was performed as a protective measure to detect a weapon, the officer claimed no concern about the defendant's being armed when he performed the second, more thorough pat-down. Without a *Terry*-type concern for the presence of a weapon, the second procedure, though termed a "pat-down," was effectively a search of the defendant's person and required a premise of probable cause. *See Terry*, 392 U.S. at 20-23, 88 S. Ct. at 1880-81. *See also Knowles v. Iowa*, 525 U.S. 113,

[3](...continued)
drive it away." The court said that, alternatively, had the officer "concluded that the car constituted a traffic hazard, he could have ordered the car towed." "So what we have here," the court concluded, "is a routine traffic stop prolonged and extended to the point that the detention, reasonable in the beginning, became unreasonable toward the end." *Morelock*, 851 S.W.2d at 840.

117 (1998) (holding that there is no justification for an exception to the warrant requirement for a search incident to a traffic stop). We progress, therefore, to the question whether this search was justified.

A positive reaction to a vehicle by a trained drug detection dog provides probable cause to search the inside of the vehicle. *England*, 19 S.W.3d at 769. In the present case, the record established that Officer Kilpatrick was trained in narcotics detection. His dog was trained to detect the presence of narcotics, was "certified" as a drug dog annually by the United States Police Canine Association, and had a proven record of such drug detections. We conclude that the dog's positive reaction to the defendant's car provided probable cause to search the car via the vehicle exception to the warrant requirement, which exception is, in part, premised upon the inherent mobility of a motor vehicle. *See id.*; *see generally Carroll v. United States*, 267 U.S. 132, 45 S. Ct. 280 (1925).

Probable cause to search the car at that point, however, did not in and of itself justify Officer Kilpatrick in searching the defendant's person. We acknowledge that probable cause to search a vehicle generally authorizes the officer to search "passengers' belongings found in the car that are capable of concealing the object of the search." *Wyoming v. Houghton*, 526 U.S. 295, 307, 119 S. Ct. 1297,. 1304 (1999). We know of no broad application of the vehicle search exception to the warrant requirement, however, that underwrites the search of a *person* who occupied the vehicle prior to the dog sniff. *See United States v. Di Re*, 332 U.S. 581, 68 S. Ct. 222 (1948) (stating that probable cause to search a vehicle did not authorize a body search of a passenger); *see also Houghton* at 303, 119 S. Ct. at 1302 (mentioning *Di Re* with approval). In the present case, an extension of the vehicle search exception is especially inapt for two reasons. First, the defendant left the vehicle before the police acquired any indication that the vehicle contained material that they would be entitled to seize; the dog apparently did not react to any substances secluded on the defendant's person. Second, a passenger in the vehicle occupied the seat near the door where the dog reacted.[4] Under these circumstances, we fail to see how the officer's ultimate, warrantless search of the defendant was justified by constitutional principles *governing vehicle searches*. *See Houghton*, at 302 n.1, 119 S. Ct. at 1302, n.1 (clarifying that the *Di Re* rule was predicated upon the situs of the search ("search of person" versus "search of property") and that the role of a vehicle's occupant (driver versus passenger) was immaterial).

In its appellate brief, the State also claims that the ultimate search of the defendant's person was justified by the exception to the warrant requirement for searches incidental to arrest. *See Chimel v. California*, 395 U.S. 752, 763, 89 S. Ct. 2034-2040 (1969) (establishing an exception to the search warrant requirement for searches incidental to lawful arrests.) The State postulates that the *Chimel* exception applies even though the actual arrest occurred after Officer Kilpatrick searched the defendant. *See Rawlings v. Kentucky*, 448 U.S. 98, 111, 100 S. Ct. 2556, 2564 (1980) ("Where the formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vice versa.").

---

[4]Evidence introduced in the suppression hearing revealed that the officers ultimately discovered drugs on the person of this passenger.

In particular, the State relies upon *State v. Dennis W. Menzies*, No. W1988-00608-CCA-R3-CD (Tenn. Crim. App., Jackson, Apr. 20, 2000).

In *Dennis W. Menzies*, the police based its reasonable, articulable suspicion that the defendant was transporting cocaine on a confidential informant's tip that Menzies transported cocaine in a vehicle mounted on a car-hauling truck or trailer. To investigate the suspicion, the police stopped Menzies' vehicle. After removing the defendant from his vehicle, they utilized a trained drug dog which reacted to the car-hauler. *Id*., slip op. at 3. As a result of the dog's reaction, the police searched Menzies and found cocaine hidden inside a fake lighter in his pocket. *Id*., slip op. at 4. At that point, the police arrested Menzies. Following a denial of his motion to suppress the cocaine and Menzies' conviction of possession and appeal, this court held that the initial stop was justified by the officers' reasonable, articulable suspicion that criminal activity was afoot, *id*., slip op at 11, which blossomed into probable cause upon the drug dog's reaction to the car-hauler, *id*., slip op. at 13. This court, via *Rawlings*, viewed the search of Menzies as incidental to his arrest. *Id*., slip op. at 14.

We discern, however, an important factual distinction between *Dennis W. Menzies* and the present case. Menzies was the owner or operator of the car-hauling enterprise, and the informant's tip had revealed that Menzies himself regularly used the purchase and hauling of vehicles as the means for transporting cocaine. In that situation, we agree with the *Menzies* panel that the drug dog's reaction yielded probable cause to arrest Menzies and search him incidentally thereto. The court was not dissuaded just because the incidental search actually preceded the arrest. In the present case, the officer lacked probable cause to arrest the defendant prior to searching him. The presence of the passenger where the dog reacted created an equipoise: Had the contraband been placed in the defendant's vehicle – and thus probably possessed by the defendant – or possessed by the passenger without the defendant's knowledge? Under the unique facts of the case, we cannot conclude that the dog's reaction resulted in probable cause to arrest the defendant. It follows, then, that the claim of a search incidental to a lawful arrest is not supported.

III. Conclusion

The result of our analysis is that the ultimate, evidence-yielding search performed by Officer Kilpatrick ran afoul of the Fourth Amendment, and for that reason, the fruits of the search should have been suppressed. Accordingly, the judgment of the trial court is reversed, and the case is remanded to the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE